## CONSOLIDATED UNDERWRITERS v. SCOTT et al. (No. 1218.)

(Court of Civil Appeals of Texas. Beaumont. May 5, 1925. Rehearing Denied May 20, 1925.)

1. **Master and servant ⬅⟝405(4) —Injury held result of willful attempt for personal reasons to unlawfully injure another.**

Evidence *held* to show that injury causing death of employee was not received in course of employment within Workmen's Compensation Act, but resulted from his willful, intentional attempt, within Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82 (4), to unlawfully injure for personal reasons one by whom he was shot in self-defense.

2. **Master and servant ⬅⟝380—Death of employee making unlawful attack on another held not compensable, though occurring during working hours on employer's premises.**

That employee making unlawful attack for personal reasons on another was killed by latter during working hours on employer's premises, where he was in furtherance of employer's business, did not make injury compensable under Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—97), in view of exceptions in article 5246—82(4).

Appeal from District Court, Shelby County; Chas. L. Brachfield, Judge.

Suit by the Consolidated Underwriters against Mrs. D. T. Scott and others, to set aside an award of compensation under the Workmen's Compensation Act, by the Industrial Accident Board, for the death of D. T. Scott, employee. Judgment for defendants, and plaintiff appeals. Reversed and rendered.

C. A. Lord, of Beaumont, for appellant.
A. D. Lipscomb, of Beaumont, Minton & Lewis, of Hemphill, and E. H. Carter, of Center, for appellees.

O'QUINN, J. Appellant filed this suit in the district court of Shelby county against appellees to set aside an award of the Industrial Accident Board, in which appellees were awarded compensation at the rate of $19.94 per week for a period of 360 weeks, beginning October 23, 1923, to be paid by appellant.

Appellees answered by general demurrer, general denial, and by cross-action.

At the conclusion of the evidence, appellant moved the court to instruct a verdict in its favor, which was refused. Appellant then filed its objections and exceptions to the court's charge, submitting the case to the jury upon special issues, on the ground that under the undisputed evidence no liability of appellant was shown. The case was submitted to the jury upon the following special issues:

"Question No. 1. Did the injury received by D. T. Scott have to do with and originate in the work of the said D. T. Scott for the W. R. Pickering Lumber Company?"
To which the jury answered: "Yes."
"Question No. 2: Was the injury to D. T. Scott received by him while he was engaged in or about the furtherance of the affairs or business of the W. R. Pickering Lumber Company?"
To which the jury answered: "Yes."

Upon the answers of the jury to the special issues, judgment was rendered in favor of appellees for $19.94 per week for 360 weeks, beginning as of the date October 23, 1923; hence this appeal.

The facts are without dispute. Because of our conclusion that the case should be reversed and rendered, we give the testimony practically in full. W. E. Tamplin, a witness for appellees, testified:

" * * * I have been connected with the W. R. Pickering Lumber Company, in connection with the sawmill business in this county, very near all the time for the past 6 or 7 or 8 years, and was so connected with this company on the 23d day of October, 1923. * * * About the 23d day of October, 1923, I was engaged in cutting and hauling saw logs to the tram road of the W. R. Pickering Lumber Company to be delivered to their mill. I was acquainted with Mr. D. T. Scott for a short time. I knew him while he was on the work in eastern portion of the county. He was employed by the W. R. Pickering Lumber Company along about and in October, 1923; he must have come there about the 1st of September or the last of August, and I knew him for a month or six weeks prior to the time

of his death. Mr. D. T. Scott was acting as assistant woods foreman for the W. R. Pickering Lumber Company, under Joe Vann. At that time the duties of the assistant woods foreman consisted of laying out spurs, and kind of do the civil engineering work, and he looked after the placing of the teams and seeing that the logs were properly located on the track, and where they were to be left at and put in quantities where they could be picked up and put on cars, and see after the railroad and spurs in a general way. He didn't have anything to do with the main line; he had supervision over the spurs. * * * I was present out on the tram road of the W. R. Pickering Lumber Company at the time D. T. Scott is said to have been shot and killed. I went out that morning to—in fact, the day before Scott was killed, Mr. Vann and Scott advised a lot of us to meet at the place where Mr. Scott was afterwards killed, so as to have an agreement as to dividing, or letting the haulers that were already hauling to put these logs on one skidway. We were pretty near up with the laying of steel on that territory, and there were a number of logs to be put on where there wasn't any steel, and at this point this skidway ground belonged to myself; in other words, they give you a quarter of a mile tract of timber, and you cut off a skidway ground, to be cut off at your own expense, but I agreed for all of the boys to put their logs on my skidway ground, but it was necessary to use both sides of the track to hold the quantity of logs. There had to be a crossing on the railroad; and in making the crossing we floor inside between the rails with planks and some on each side, so as to pass the wagons, so as to enable the haulers to dump the logs on both sides of the track. We had an agreement to be there that day of the killing to see about fixing the crossing and dividing up the space to the haulers. Several of those contractors were interested; there were over 20, I expect. As to when I first saw Scott on the day of the killing, I will state that I met Scott about half a mile from where he was killed. They rode up by the track north of where he was killed with the track scaler by the name of Bradshaw, and talked to Bradshaw about something, and Scott rode up. I didn't see him ride up; the first I saw of him he was on the ground. We were then about half a mile from the place where he was killed. When I went to the place where the killing occurred, Scott was not there. I had already been to the place where we were to meet that morning, and he hadn't come, nor Mr. Vann, to show the contractors anything, and I casually rode off up the track, and when I met him I turned and rode back to the place where they were making the crossing. As to what Mr. Scott said at the time I saw him on the track when I first met him, in regard to going over and attending to those matters, I will state that he said, to me, 'Let's go down and place those teams;' referring to the arrangement of the teams of the haulers. I then went on immediately to the place, and went to the place where he was afterwards killed, and got down and hitched my horse, and Scott rode up to get the boys to show the boys the log haul. About 15 or 20 minutes afterwards I saw him riding back to where the crossing was to be made, and he came up to where I was, and where the parties were that killed him, and the shooting began. When we met there where the crossing was to be made, and where this understanding that this log haul was to be divided up so that they could dump all the logs on my skidway, as to whether or not there were a number of contractors or haulers there, I will state that there were a number there when I got there first, but when I got back there were only a few there; they had scattered back, and I suppose they had given Scott and Vann out; there were half a dozen there, maybe. They were waiting for Mr. Scott and Mr. Vann to come. When Mr. Scott rode up to about 20 or 30 steps of those parties, they commenced shooting at him, and he was killed. At the time the shots were fired Mr. Scott was going immediately in the direction of where we were assembled. This shooting that resulted in Mr. Scott's death occurred on the premises occupied and was then being used by the W. R. Pickering Lumber Company; it was on their land, and was on one of their tramroads. Mr. Scott died immediately after he was shot; he was dead almost time he hit the ground. Mr. Scott came up on horseback and was shot off his horse."

On cross-examination he testified:

"The weapon used was a shotgun, and there were three of them—Leonard Brown and his father, and a man by the name of Huffman. All of them used shotguns. As to whether I am able to say who fired the shots and in what order, I will state that the shooting occurred just a little to my left and a little behind me; the first report was a good deal like a big rifle, they all fired in pretty rapid succession, and the two next shots I would say were a good deal like No. 12 shotguns. The fourth shot was fired as close to me as that desk there, pretty near, and Mr. Leonard Brown was up in plain view of me, and Mr. Scott too; I was looking at Mr. Scott, and not at the boy who fired the first three shots. The last shot killed Mr. Scott, and Mr. Leonard Brown fired that shot; the other shots fired missed him. Mr. Scott was armed with an automatic pistol. As to what he was doing with it at the time the shooting was going on, I will state that, just as the last shot was fired, Mr. Scott I thought reined his horse like he was going to bring it to a halt, and he raised his pistol something like that height from his face, and about that distance when the last shot was fired. I expect the shot that hit him in the jaw was the only one that took effect; there was only one shot anywhere else, and that was in his thumb. I saw Mr. Scott when he commenced to try to draw his pistol. I estimate that that occurred when he was about 50 to 60 yards away; before he got up there. He must have been about 20 or 25 steps away when the shooting commenced; he was right close. He rode some distance from the time that he drew his pistol, or attempted to draw it. As he rode up towards these men, I saw him commencing to draw his pistol, and about 50 or 60 yards away. He never raised the gun to a shooting position until the fourth shot. As to whether I saw him drawing his pistol for about 50 yards, I will say, No, sir; he was about that distance from us; he swung around in his saddle a little bit, and I saw him getting his pistol—I know he

did for he afterwards did get it, and he came on several steps of the horse before he got his gun. He went about half the distance from the place where he first put his hand back in his pistol pocket, up to the place where Mr. Brown was standing before he was shot. He was coming right straight towards him. Mr. Scott was alone. As to whether I heard Leonard Brown say anything while Mr. Scott was lying there on the ground and immediately after the shooting, and while the persons who participated in the shooting were there, I will state that, immediately after Mr. Scott was shot and hit the ground, I walked up to him. Immediately after the last gunshot, the shot that killed him—he struck the ground pretty well straightened out on his face, and I think I turned him over myself, and I walked up to him, and he had fairly gotten on the ground—he was right close to me when he fell, and he seemed to be perfectly dead, and Leonard walked up and said, 'Now, you damned son of a bitch, kick somebody else and call him a dog.' That was all that he said in regard to Mr. Scott. * * * "

Leonard Brown, witness for appellant, testified:

"My name is Leonard Brown. I am 32 years old. I am now living in Louisiana and logging for the Wyatt Lumber Company. I lived in Shelby county for about 31 years; practically all my life. I saw this man, D. T. Scott, on the 23d day of October, 1923. I became acquainted with him and knew what his name was on the 22d day of October. I saw him on the 22d day of October; I was not acquainted with him before that time; I had never spoken to him before that day. On October 22 I saw Mr. Scott with Mr. Graves and Mr. Joe Vann, about 150 yards from the old Buckley field; he was about 300 yards from the hardwood camp of the W. R. Pickering Lumber Company, which was also about 300 yards from where my wife was running a boarding house, in Shelby county. That was early in the morning. I was with Mr. Graves, and we met Mr. Vann and Mr. Scott, who were together. As to what passed between me and Mr. Scott and Mr. Vann, I will state that me and Mr. Graves were walking along and met them, and when we met them Mr. Vann spoke and we spoke; and Mr. Vann asked me what part I played down there, and I told him, 'Not anything particular,' and Mr. Scott got down off his horse and came around to where I was at and struck me with his fist and hit me on the side of the face, and when he did I clinched with my hands both of his arms and threw him as far as I could away from me, and Mr. Vann drew out his gun, and I broke and ran around towards the house opposite the three men—Mr. Scott, Mr. Vann and Mr. Graves—and went up a little branch making for the house or camp, and Mr. Vann came in behind me with his horse, and Mr. Scott got on his horse and went straight towards the house and headed me off from the house, and Mr. Vann threw his gun on me and made me stick up my hands, and Mr. Scott got down off his horse, and Mr. Scott threw his gun on me and made me hold my hands up until Mr. Vann got off of his horse and dropped the reins, and they rushed into me and were beating me with their six-shooters. Mr. Scott struck me with his six-shooter there on the forehead. They beat me down to my knees, and I caught every lick I could, and finally they got me down, and Mr. Vann got on top of me with his shoulders and punched me in the face with his gun a time or two, and they got up and Scott kicked me in the side right here with a pair of boots, and cursed me for a black son of a bitch, and dragged me up and told me to get in the road ahead of them, and that they wasn't half through with me. I ran from under my hat where they first jumped on me, and they went right along the road towards the river, and I asked him to let me get my hat, and Mr. Vann threw his gun on me and Mr. Scott stopped and got my hat and said, 'You black son of a bitch, I ought to make you go without your hat.' And we went to the old Buckley field and got to where the roads fork again, and they told me to stop and I stopped, and they told me to take the left-hand road, and I took it, and half way through the field; and they asked me if I told Dr. Anderson, I think that was him, and Dr. Parrish about getting discharged from the Pickering Lumber Company, and I told them I didn't, and they cursed me and told me I was all kinds of a liar and a black negro, and everything and told me if I denied that they would kill me; and Mr. Vann ran his horse behind me and his horse stepped on my shoe, and he hit me again with his six-shooter right along there, and Mr. Scott said, 'Let's just kill the son of a bitch,' and I begged them not to do it, that I had a wife and two children and it wasn't right, and they finally told me they would let me live, but that they were going to put me across the Sabine river, and if I ever made any track in the state of Texas, they would kill me. And they marched me down to the track, and my side was hurting so, and my head, that I felt like I wasn't able to go; and Scott told me to move up, and I told him I wasn't able to go any faster and he cursed and told me I was and rode close to me; and just as we got to the track they told me not to speak to a human on the track, and said, 'I have let you live so far, but I am going to kill you;' and I never spoke to anybody. And they told me when I got to the track and hit the track for Haley's Ferry, and I did so, and there was a trestle or so to cross, and when we crossed these they spurred their horses up and had to go around, and they went around one at a time, and passed that way to the river; and I asked them to carry a note back to my wife, and Scott told me he wouldn't carry anything to my wife; that I could write after I got to Louisiana if I wanted to know anything; and they got me to the river, and they told me to get in that boat there, and my brother was right there close, and they told me not to talk to him, and Scott told me that somebody could bring the boat back, and I got in the boat and went across on the other side of the river. I got on the other side and got out of the boat, and they stayed about a minute and a half and rode their horses off up the river bank, and my brother asked me when I passed him what was the matter, and I didn't open my mouth; and so after I got over he asked a boy named Lee to bring his boat back there, and he carried the boat back to him, and came across, and asked me what was the matter, and I told him just exactly what happened, and he asked what I was going to do. My brother and I got in a

car and went around to Logansport, and I came here to Center that day and went before the grand jury that same day, when I got to town. I disremember who was foreman of the grand jury, but Mr. Green Rushing was on the grand jury. I went to the doctor's office then and got him to dress my head. Then I went back to Louisiana to my father's. My brother got the car of my brother-in-law, and I had my brother before the grand jury, too. I went back to my father's that night and stayed, and got up the next morning and went back home, and rode back to the ferry and left the car there, the one that I got from my brother-in-law, and went back home and went to the house, and I had some work cattle there; and Mr. Vann and Mr. Scott had told my brother and the fellow driving the cattle—that was using them—that they 'had to get them cattle away from there and get them off the Pickering Lumber Company's premises; I don't want them there.' Part of the cattle were mine and part belonged to other parties; several were interested in them, and they were left there on my hands; and I told Pete McGinnis to meet me there at Golden's camp; and there were about nine or ten steers still loose in the bottom, and get them all up that day, and I would get them out of there; and I went to Golden's camp, and just before I got to Golden's camp towards the trestle— Before I got to it there is a long trestle, and I seen Mr. Scott ride up and I sat down when I saw him. I had a double barreled shotgun, loaded with two No. 4 squirrel shot ringed shells. Ringing the shells has the effect of making all of that load of shot go together. My gun was loaded in that fashion, and I sat down. Mr. Scott stood a few minutes and rode away, and he was gone a few minutes, and I walked over and sat down on the skidway of logs waiting for McGinnis, and I sat there about 10 minutes or longer, and I seen Scott come back towards me, and when he got in about 60 steps of me, he went to reaching in his pocket, I suppose after a gun; that is what he brought out; and when he did I went to shooting. He was coming towards me with his six-shooter right on me. He had his six-shooter on me when I shot the last time. As to whether I am able to say how far he came towards me in attempting to get his pistol, I will state that he was on his horse, and I stepped three steps towards him, as well as I remember, from where I sat down on the log. There was not anything between me and him; when he went to pull the gun he passed by a red oak tree about 24 inches through, or maybe larger. He had a pistol turned right towards me when I fired. When the shooting was over I suppose he had it out and on the ground. I shot this man for the protection of my life, because he told me when he put me across the Sabine river with his six-shooter that if I put foot on the state of Texas soil, and he laid eyes on me, that he was going to kill me; and I thought he meant to do what he said he was going to do, and I felt like my life was worth as much to me as his was, and I shot him to kill him. That is absolutely the only reason I had for killing him."

On cross-examination he testified:

"As to how long I had been employed by the W. R. Pickering Lumber Company when Mr. Scott came on the job, I will state that I had been discharged from the Pickering Lumber Company duties. As to how long it had been from the time I was first employed by the Pickering Lumber Company until Scott came on the job, I will state that I first commenced working for them when they built the mill in 1913. As to whether I had lived on their premises and was employed by the mill from that time until a short time before Scott came on the job, I will state that I worked for them at the mill; I contracted logging for them in 1922, and worked until April or May, 1923, scaling and checking up for the hardwood logging department, and was discharged from that job by Mr. Vann. As to what my duties were in a general way in connection with their hardwood timber during this last period of employment from September, 1922, until April or May, 1923, I will state that it was scaling hardwood logs, and checking up the cut, and placing the teams, and taking care of the hardwood logging department. As to whether my duty in looking after the hardwood logging was about the same in looking after the cutting and handling of pine logs, I will state that my job was looking after the hardwood logging department and the skidway scale, cutting and hauling from the track back and scaling on the track. I was working under Mr. Vann; I went to work under Mr. John Windham, and continued to work under Mr. Vann until he let me out. I worked under Mr. Vann, general woods foreman, from October until I was let out in the spring. As to whether, prior to the time Mr. Vann discharged me, there was any friction or disagreement arisen between me and Mr. Vann regarding the cutting and handling and assembling of hardwood logs, that I had anything to do with, I will say, No, sir, the only difference between us when he discharged me, my time was short in the office, and I went to Mr. Vann and asked him to correct my time, and he did so. As to whether or not, after I was discharged by Mr. Vann, I made a report to the superintendent or any officers of the Pickering Lumber Company, of any authorities in charge of their business to the effect that there had been hardwood logs cut under your supervision and knowledge that had not been moved to the railroad track and mill, I will state that on the inventory of August there was about 15,000 logs short. I did report it. The inventory of the month of August showed about 15,000 logs shortage, and Mr. Vann accused me of being the cause of the log shortage to different people, and also to the Pickering Lumber Company, and I went to Mr. Tucksworth, and told him that I hadn't asked for anything but a fair deal, and that Mr. Vann had accused me to citizens and different people, and they were coming to me with it, and that was neither here nor there; and I asked Mr. Tucksworth to let me show him the logs—Mr. Tucksworth is general superintendent of the Haslam mill—I asked him to let me show him the logs and give me full recourse; those logs were not even where I cut them, and not even on the survey; and show that I didn't have the logs cut, and that they were on different tracts of land and on another man's work, and I didn't feel like I ought to be accused of doing the work, and they were putting it on me, and I told Mr. Tucksworth I wasn't going to stand for it. I had been in-

formed that he told him in the presence of two or three men that I was the damnedest liar he ever heard, or ever saw, and I wanted to show him the facts and wanted a clear record. And I told him standing at the Polley Hotel, and he told me he didn't believe they were out there; and I asked him to go with me personally himself and let me show him, and that I wasn't asking him for a job with the Pickering Lumber Company, but was asking for a clear record of it, and not be accused of stealing anything from the Pickering Lumber Company. Then I went to Mr. Robinson at Pickering, La.; he is the general superintendent of the Pickering Lumber Company; and I told him. I went to see him on particular business, and he told me to meet him at Pickering, La., at their head office of the Pickering mill. That was on the 1st of September, 1923, I think; and I went to Pickering, La., and had a private conversation with Mr. Robinson, and told him exactly what I told Mr. Tucksworth, and told Mr. Robinson that I wasn't asking for anything but a clear record at all, and that I wanted it straightened up and wanted it cleared; and he told me to go back home and remain there; that Mr. Weaver was in California, the head timber man; and he wrote him when he returned home to get me and go to the woods and look up the logs and make a report on it. And when Mr. Weaver returned I met him on the streets, and he told me to be ready and that he would start to work on it. I refer to Mr. Noble Weaver, who lives in Center; he is their general timber man. As to how long it was before Scott was killed that Mr. Weaver returned from California, I will state that I think he came on the 10th of September. As to how long it was after he came back before I went to see him about the matter, I will state that he came on Sunday, and we went to work the next week. I went in person with Mr. Weaver to look over the timber. As to how long we were engaged in it, I will state that this trouble came up, and we never completed that job. As to whether I was engaged in that when the killing occurred, I will state that Mr. Robinson asked me to show Mr. Weaver every log cut and left on the Pickering Lumber Company holdings, and also W. I. Davis and other parties they purchased timber from; and if I worked there until yet I wouldn't be through there yet. As a matter of fact, I was employed by the Pickering Lumber Company to assist Mr. Weaver. Every day I worked he paid me $4.10 per day for it. As far as I went and checked up the logs I found them just as I represented it to be. Joe Vann is the one who was responsible for leaving those logs there in the woods. From the time that I took this matter up with Mr. Robinson and had an understanding with Mr. Robinson that I would go out with Mr. Weaver and check up and scale the logs, as to whether I had seen Mr. Vann, until the day before the shooting, I will say that I seen Mr. Vann every now and then; I saw him frequently. I did not have any conversation at any time from the time I took the matter up with Mr. Robinson and the time of the killing in regard to the matter of assisting in checking up the logs; I never had a word about business with Mr. Vann after he discharged me, only to straighten my time that was short, and he did so. On the first of this first difficulty, which

was the day before the shooting of Mr. Scott, as to whether Mr. Vann was still general woods foreman for the Pickering Lumber Company, I will say I suppose so. I suppose Dave Scott was assistant at that time under Mr. Vann; that is my understanding. Joe Vann was still general woods foreman on the day of the shooting, and Dave Scott was assistant woods foreman, as far as I know. Aside from the matters that I have already testified about, as to whether there had not occurred between me and Mr. Vann and Mr. Scott, any trouble whatever aside from what I have testified about, until the first assault that I have testified about the day before the killing, I will state that there never had been any trouble between me and Mr. Vann, and I never knew Mr. Scott at all."

On redirect examination he testified:

"It was either April 1st or May 1st that Mr. Vann had discharged me. As to whether I had met and passed and repassed him frequently or occasionally, I will state that my wife ran the boarding house for the hardwood department, and was at that time, and I passed and repassed Mr. Vann in the woods. As to whether the salutations between me and him were friendly and ordinary or not, I will state that I did not say anything to Mr. Vann, only we were just supposed to be friendly; all that I knew anything about was when he told that the log shortage lay to me, and was cursing me then about it to other people. Mr. Vann never said anything to me at all. When I reported the log shortage I was not in the employ of the company at all; I had been out of the employ of the Pickering Lumber Company for some time; that occurred in the August inventory, and he let me out about the 1st of April or May. During that time I was not in the employ of the company at all. My wife was running the boarding house for the people, and of course I was home all right; but during this log shortage controversy I was not employed by the company at all. I had never heard of Scott at the time this controversy was going on. The first time I ever saw Mr. Scott, to know him, was that morning that he struck at me with his fist; I had heard people say that he took Mr. Cannon's place, and I called Mr. Scott's name one time in my life with Mr. Weaver. Mr. Weaver asked me who taken Mr. Cannon's place, who had been assistant woods foreman when I worked for them, and I told him I didn't know, but I heard some of them say a man by the name of Scott. This Mr. Cannon was assistant woods foreman from the time I was let out, back in April or May, down to the time Scott took charge the 1st of October."

On recross-examination he testified:

"As to whether Scott took charge of the work, when he went on the job, that I had been attending on while I was employed, I will say, No, sir. If Scott was assistant woods foreman, I don't know who had charge of the hardwood department. I testified a while ago that while I was employed from September, 1922, until the spring of 1923, I was checking up the cutting and assembling of hardwood, before they let me out from that job. When Mr. Scott came on the job he did not have charge of that particular kind of work that I

had been doing before I was let out; Mr. Bradshaw had charge of the hardwood, and Mr. Scott was assistant woods foreman. Mr. Bradshaw was holding the job that I had. He was under Mr. Vann; that was about 20 that they had since they let me out, and Mr. Bradshaw had charge of it at that time. Those logs that Mr. Weaver and I were looking up and checking and scaling were cut and the worms had ruined them."

Sam Nichols, witness for appellant, testified:

"I know young Leonard Brown here. I remember when Mr. Scott was killed in October, 1923. I did not see the killing. The day before the killing I saw Leonard Brown and Mr. Scott and Mr. Joe Vann going down the road or right of way, where we were at work, and Mr. Brown was in ahead of Mr. Vann and Mr. Scott; they were on horses and he was afoot, and they carried him towards the river, on the right of way, towards the end of the right of way towards the river, down towards the ferry. That was the Sabine river. Mr. Brown had his hat off, and his head was very bloody, and that is the last I saw of Mr. Brown. I did not hear anything said by Mr. Brown. He passed in about 12 feet of me. Mr. Scott was traveling in about 10 feet of him. They were both behind Mr. Brown, if I make no mistake.".

[1] We think the case should be reversed and rendered because:

(1) The injury received by Scott and which caused his death was clearly not received in the course of his employment within the contemplation of the Workmen's Compensation Act, but was an injury originating out of and resulting from the acts of Scott in a matter not pertaining to his employment or any duty he owed to his employer in the discharge or scope of his employment, but on the contrary, a matter entirely personal between him and Leonard Brown. Scott's injury was inflicted by the act of a third person, intended to injure him because of reasons personal to him, and not directed against him as an employee of the Pickering Lumber Company or because of his employment. This is shown by all the facts. Brown did not know Scott, had never met him until the day before the killing. At their first meeting, accidental as it was, Scott espoused the cause of his associate, Vann, and joined him in an unwarranted, unprovoked, most outrageous, and unlawful attack upon Brown, using a deadly weapon, a pistol, and therewith beat and bruised Brown, unlawfully arrested him, and thereafter unmercifully abused and maltreated him, marched him to the border of the county, which happened to be the border of the state, made him to cross over the state boundary into the state of Louisiana, and told him if he ever made another track in the state of Texas, he, Scott, would kill him. What did this outrageous conduct of Scott have to do with his employment or work for the lumber company? This was the beginning of the matter that ended in the death of Scott, and it seems perfectly clear that the shooting and killing of Scott grew out of and was caused by the acts of Scott in a personal matter between him and Brown.

(2) The injury received by Scott, and which resulted in his death, was clearly not received in the course of his employment, within the provisions of the Workmen's Compensation Law (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—97), but was an injury caused by and growing out of Scott's willful intention and attempt to unlawfully injure Leonard Brown, the person who shot and killed Scott. Article 5246—82, Vernon's Civil Statutes, provides:

"The term injury, * * * as used in this act, shall not include * * *

"4. An injury caused by the employé's willful intention to and attempt to injure himself, or to unlawfully injure some other person.".

We will not here repeat the facts disclosed as occurring at the time Scott was shot. They are fully set out above in the very words of the witnesses. They show that when Scott saw Brown he deliberately reined his horse, turning and going directly toward Brown and, at the distance of some 60 steps from Brown, drew his pistol and rode straight toward Brown, and continued to do so until he was shot from his horse, falling within a few feet of Brown, and at the time the fatal shot was fired he was leveling his pistol on Brown. Scott had told Brown the day before, when he and Vann had unlawfully arrested Brown, beat him up, and marched him across the borders of the state into Louisiana, that he must not return to Texas, and that if he ever put his foot on Texas soil that he, Scott, would kill him, and Brown testified that when he saw Scott drawing his pistol and starting toward him, he thought that Scott was going to carry out his threat to kill him, and that he shot Scott for that reason and none other. We do not think that it could be seriously contended that Scott was not making an intentional, deadly, and unlawful assault in and upon Brown, and attempting to injure him at the very time that Brown shot and killed him. With the undisputed facts herein shown before any jury, they would find that Brown shot and killed Scott in his own proper self-defense. Under the law (article 5246—82), and the undisputed facts, the injury to Scott is not compensable.

[2] Appellees, in the oral presentation of the case to the court on submission, contended, if we understood their position, that even if Scott was making an unlawful attack upon Brown which caused Brown to shoot and kill him, still liability, under the law, would exist, for the reason that Scott was killed on the premises of his employer; that he was there in the furtherance of his employer's business, and that the injury occurred within

working hours, and hence these facts made the injury a compensable one. We cannot agree to this interpretation of the law. To do so would be to nullify all the exceptions contained in article 5246—82, and be directly in the face of the express intent of the Legislature not to include certain injuries within, the law.

Appellant's request for an instructed verdict should have been granted. No liability being shown, the judgment is reversed and here rendered for appellant.

Reversed and rendered.